## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONSERVATION FORCE, et al.,

      Plaintiffs,

         v.

KENNETH SALAZAR, in his official
capacity as Secretary of the United States
Department of the Interior, et al.,

      Defendants.

Civil Action No.  10-1057 (JDB)

## MEMORANDUM OPINION

Plaintiffs, organizations and individuals that support sustainable hunting of the Canadian wood bison, bring this lawsuit alleging that the Secretary of the Department of the Interior, acting through the Fish and Wildlife Service, has violated several provisions of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 et seq., in his treatment of the wood bison. Plaintiffs' core claim is that the Fish and Wildlife Service ("FWS") acted arbitrarily and capriciously in denying the individual plaintiffs' applications to import wood bison hunting trophies.  Plaintiffs also challenge FWS's failure to conduct mandatory 12-month and five-year reviews of the wood bison's "endangered" status under the Act.  Finally, plaintiffs claim that FWS has violated "a bundle of duties" under the ESA.  Plaintiffs have moved, and FWS has cross-moved, for summary judgment on all claims.  See Plfs.' Mot. for Summ. J. [Docket 33] ("Plfs.' MSJ"); Defs.' Mot. for Summ. J. [Docket 34] ("Defs.' MSJ").  For the reasons explained below, the Court will grant FWS's motion for summary judgment as to Counts I, II, and IV, and will grant plaintiffs' motion for summary judgment as to Count III.

1

## **BACKGROUND**

### I. Statutory and Regulatory Background

This Court has already resolved prior litigation involving the same parties and the same events, and will draw on its previous opinions here. See Conservation Force v. Salazar, 715 F. Supp. 2d 99 (D.D.C. 2010) ("Conservation Force I"); Conservation Force v. Salazar, 753 F. Supp. 2d 29 (D.D.C. 2010) ("Conservation Force II").

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978) (internal quotation marks and citation omitted). It is intended to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). To this end, the Act directs the Secretary of the Department of the Interior ("the Secretary") to classify species whose survival is in danger as "endangered" or "threatened." See 16 U.S.C. § 1533. A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20).

Individuals may petition the Secretary to list, downlist, or delist species. See id. § 1533(b)(3). After receiving any such petition, the Secretary must, "[t]o the maximum extent practicable," make a finding within 90 days "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). And "[w]ithin 12 months after receiving a

petition that is found . . . to present substantial information indicating that the petitioned action

may be warranted," the Secretary must determine whether the petitioned action is warranted, is

not warranted, or is warranted but is precluded by pending proposals concerning other species

("12-month finding").  Id. § 1533(b)(3)(B).  The Secretary must also review whether a species is

correctly listed every five years, regardless of whether he receives a listing or downlisting

petition ("five-year review").  Id. § 1533(c)(2).

The ESA generally prohibits the importation of endangered species in any form,

including hunting trophies.  See id. § 1538(a)(1)(A), (c)(2); 50 C.F.R. § 17.21(b).  Importation of

threatened species, with some exceptions, is also prohibited.  See 16 U.S.C. § 1533(d); 50 C.F.R.

§§ 17.31(a), 17.32(a).  Certain endangered or threatened species may be imported, however, "for

scientific purposes or to enhance the propagation or survival of the affected species."  16 U.S.C.

§ 1539(a)(1)(A) (allowing Secretary to "permit, under such terms and conditions as he shall

prescribe . . . any act otherwise prohibited by section 1538 of this title for scientific purposes or

to enhance the propagation or survival of the affected species.").  Individuals seeking to import

hunting trophies of an endangered species must apply for a permit and satisfy a number of

application requirements.  See 50 C.F.R. § 17.22.  Upon receipt of a permit application, the

Secretary must publish a notice of the application in the Federal Register and allow a 30-day

period for comments.  Id.  In determining whether to grant the application, the Secretary "shall

consider" the following criteria:

> (i) Whether the purpose for which the permit is required is adequate to justify
> removing from the wild or otherwise changing the status of the wildlife sought to
> be covered by the permit;
> (ii) The probable direct and indirect effect which issuing the permit would have
> on the wild populations of the wildlife sought to be covered by the permit;
> (iii) Whether the permit, if issued, would in any way, directly or indirectly,

conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.22(a)(2).

In administering the ESA with respect to species found in other countries, the Secretary must take into account certain special considerations. Under 16 U.S.C. § 1537(b), the Secretary "shall encourage . . . foreign countries to provide for the conservation of . . . wildlife . . . including endangered species." In the listing or delisting context, the Secretary must consider "th[e] efforts . . . being made by any State or foreign nation . . . to protect [endangered or threatened] species," and should allow any affected foreign nation to comment on a listing or delisting proposal. 16 U.S.C. §§ 1533(b)(1)(A), (b)(5)(B). With respect to permit determinations, however, the Secretary has no specific duty to consider or defer to a foreign country's conservation program, aside from his general duty to "encourage" such programs.

## II. Factual Background

The Canadian wood bison, found in portions of northwestern Canada, was by the late 1800s hunted nearly to extinction. See 74 Fed. Reg. 5908, 5909 (Feb. 3, 2009). In 1970, it was classified as an "endangered" species in the United States under the statutory predecessor to the ESA, and it has remained so listed. Id. In Canada, a wood bison recovery plan was implemented in 1973, and the wood bison was formally listed as endangered in 1978.

Administrative Record [Docket Entries 23-25] ("AR") at 4, 83. Based on the success of the recovery plan, the wood bison was downlisted to "threatened" status in Canada in 1988.  AR 83. As of today, over 4500 wood bison live in free-ranging, disease-free herds in Canada.  AR 282.

Canada permits limited hunting of wood bison in some circumstances.  Between 2000 and 2004, the four individual plaintiffs to this action purchased wood bison hunts in Canada, and each then successfully hunted a wood bison.  Conservation Force I, 715 F. Supp. 2d at 101. With Conservation Force's assistance, they each applied to import their wood bison trophies into the United States.  Id.  In 2009, when the permits had still not been processed, plaintiffs filed a lawsuit.  Id.  FWS then denied all four permits on the ground that "there is insufficient evidence to support the concept that this import of a sport-hunted trophy would provide a 'conservation' benefit to the wood bison."  Id. at 102; see also AR 305-16, AR C335-C341.

In November 2007, the Canadian National Wood Bison Recovery Team ("the Team"), which is not affiliated with Conservation Force or the plaintiffs, petitioned FWS to downlist the wood bison from endangered to threatened.  Conservation Force I, 715 F. Supp. 2d at 101-02. The Team's petition stated that the wood bison's "populations are healthy," its "habitat remains plentiful," and conservation "recovery and management plans are being implemented."  Id.  In February 2009, FWS issued a 90-day finding.  Id.  The finding concluded that the Team's downlisting petition "presents substantial scientific evidence and commercial information indicating that reclassifying the wood bison from endangered to threatened may be warranted." Id.  FWS failed, however, to conduct the 12-month review required by 16 U.S.C. § 1533(b)(3)(B) or the five-year review required by 16 U.S.C. § 1533(c)(2).

In the prior litigation between these parties, plaintiffs challenged FWS's failure to

conduct the 12-month review.  See Conservation Force I, 715 F. Supp. 2d at 102-04.  This Court

dismissed plaintiffs' claims because plaintiffs had not filed an adequate notice of suit, which is

jurisdictional under the ESA.  Id.  During the course of the prior litigation, the Secretary

represented to the Court that the review would be completed by September 15, 2010.  Id. at 104

n.5.  However, the Secretary was unable to complete the review by that time due to "competing

court-ordered commitments" in other cases.  Defs.' MSJ at 2-3 n.1.  But on January 31, 2011,

eleven days after plaintiffs filed their motion for summary judgment in the instant litigation,

FWS completed the 12-month review, "which also serve[d] as the Service's five-year review."

See Not. of Completion of 12-Month Finding and Five-Year Review [Docket 36] at 1-2.

### III.  Standard of Review

Plaintiffs' claims fall under the Administrative Procedure Act ("APA").  The APA

requires that the Court "hold unlawful and set aside agency action, findings, and conclusions"

that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).  The "scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs.

Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The agency's

decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v.

Volpe, 401 U.S. 402, 415 (1971), and although the "inquiry into the facts is to be searching and

careful, the ultimate standard of review is a narrow one," id. at 416.  The Court must, however,

be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made."  Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (internal quotation marks and

citation omitted).  Federal courts are particularly deferential towards the "'scientific determinations'" of the agency, which are "presumed to be the product of agency expertise." Franks v. Salazar, 816 F. Supp. 2d 49, 55 (D.D.C. 2011) (quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)) (alteration omitted).

In the APA context, the purpose of summary judgment is to decide whether agency action is supported by the administrative record.  Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985).  This Court "sits as an appellate tribunal" to determine, as a matter of law, whether the agency's actions were rational.  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Subject to limited exceptions, the Court's review is confined to the administrative record.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## IV.  Discussion

### A.  12-Month and Five-Year Listings

Count I of plaintiffs' complaint challenges the Secretary's failure to make the requisite 12-month finding on the proper classification of the wood bison, and Count II challenges its failure to conduct a five-year review.  It is undisputed that neither review was conducted within the prescribed statutory time limit.  Now, however, the combined 12-month and five-year review has been completed.  See Not. of Completion of 12-Month Finding and Five-Year Review [Docket 36] at 1-2.  Plaintiffs' claims are therefore moot.  United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1135 (D.C. Cir. 2009); Marcum v. Salazar, 810 F. Supp. 2d 56, 67-68 (D.D.C. 2011); see also Spencer v. Kemna, 523 U.S. 1, 18 (1998) (noting that a court cannot rule

on other questions if case is moot).

Plaintiffs do not contend that these claims are not moot, nor have they argued that the 12-month review cannot also serve as the five-year review.  Accordingly, the Court will grant defendants' summary judgment motion as to Counts I and II.

### B.  Permit Denials

Plaintiffs' primary claim is that FWS acted arbitrarily and capriciously in denying the four individual plaintiffs' applications to import their wood bison trophies.  As explained above, FWS was required to determine whether granting the permits would "enhance the propagation or survival" of the wood bison.  16 U.S.C. § 1539(a)(1)(A).  FWS "shall consider" the factors in 50 CFR § 17.22 in making that determination, and "may" issue a permit depending on the outcome of those factors.  Id.

Plaintiffs describe the administrative record as follows:

The administrative record does not reflect "disagreements between experts," and certainly does not contain a "vigorous debate" regarding "complicated scientific and policy matters" as propounded by Defendants. See [Defs.' MSJ] at 19. On the contrary, it reflects a consensus among expert scientists that the permits should be granted. The only apparent disagreement arose when a lawyer, "Attorney-Advisor Shawn Finley" was introduced into the mix.  It is apparent from the turn of events that Attorney Finley pushed for denial of the permits (despite all scientific evidence in favor of granting them), yet Defendants have failed to offer any information or explanation regarding Attorney Finley['s] position, reasoning, or rationale. . . . All substantive information regarding Attorney Finley's position has been redacted from the record under the guise of the attorney-client privilege.

Plfs.' Opp. to Defs.' MSJ and Reply in Supp. of Plfs.' MSJ [Docket 38] ("Plfs.' Opp.") at 2-3.  In the Court's view, that is a fair general description of the record.

The administrative record shows that FWS began gathering documents and information on the wood bison between 1999 and 2002, when plaintiffs first applied for the import permits.

The most important of these documents was the Canadian government's October 2001 update of its National Recovery Plan for Wood Bison ("the Plan"), which laid out a detailed survey of the existing wood bison population in Canada and the long-term recovery strategy for the species. The goal of the Plan was to create four geographically separate herds of healthy wood bison.  AR 87.  As of the date of the Plan in 2001, there were 2818 wood bison living in six free-ranging, disease free herds; two of those herds, the Mackenzie and Yukon herds, were above the target size of 400.  AR 80, 87.  The Yukon herd consisted of 500 bison in 2000, and the Yukon government planned to keep the herd's population at approximately that level.  AR 87 (citing the 1998 Yukon Bison Management Plan).

The Plan discussed at length the challenges facing the wood bison.  The primary challenges were disease and the prevalence of diseased herds, which left limited habitat available for the expansion of non-diseased herds.  AR 103-07.  To address those problems, the Plan recommended that wildlife officials develop a long-term strategy to deal with diseased herds in Canada, and undertake near-term reintroductions of wood bison in Alaska and Siberia.  AR 81, 104, 107.  The Plan explained that the captive, disease-free wood bison population on Elk Island National Park ("EINP") had provided founder stock for past reintroduction efforts and could "serve[] as the national breeding herd" for future reintroductions.  AR 86, 110-11; see also AR 18.  The Plan also noted that wild populations that had exceeded populations goals could serve as a source of founder stock, and specifically cited the availability of the Mackenzie herd in the Northwest Territories.  AR 111.

The Plan discussed the effect of the wood bison recovery project on the aboriginal populations who lived in the wood bison's historic range.  A stated goal of the Plan was to

"contribut[e] to the aesthetic, cultural, economic, and social well-being of local communities and society in general" by reviving the wood bison population.  AR 80-81; see also AR 113.  In the context of reintroduction efforts, the Plan drafters found that "[t]he support and participation of local communities are important prerequisites for successful reintroduction projects in these jurisdictions."  AR 111.  To achieve that participation, one of the strategic initiatives of the Plan was to "garner public support for wood bison recovery . . . and develop cooperative management recovery projects with aboriginal people [and others]."  AR 81.

The 1999-2002 portion of the administrative record also contained correspondence between FWS staff and Canadian officials, all of whom strongly supported granting the permits. Kent Jingfors, the director of the Fish and Wildlife Branch in the Yukon, wrote to Teiki Saito, then the Chief of the Division of Management Authority in FWS, in support of the plaintiffs' applications.  AR 67.  Jingfors explained that the Yukon government's "current management objective" was to maintain the wood bison population at 500 "to reduce the impact of bison on other ecosystem components."  AR 67.  Because the herd was growing by 15% each year, maintaining a population of 500 required harvesting 70-80 bison annually.  Id.  Hence, Jingfors explained, the Yukon Fish and Wildlife Branch was "using a closely monitored permit hunt . . . as an important conservation tool to limit bison numbers to their habitat carrying capacity."  Id. Jingfors also noted that several groups involved in wood bison hunting had given "generous contributions" that funded a special "Bison Research account of the Yukon Fish and Wildlife Enhancement Trust Fund."  Id.

Several Canadian officials wrote emails and letters explaining why limited hunting was permitted in certain herds even though the objectives of Canada's national recovery plan had not

been met.  In 1999, Doug Stewart, the Director of Wildlife and Fisheries in the Northwest

Territories, wrote to Mike Carpenter, a biologist at FWS, to explain why hunting was permitted

in the Mackenzie herd.  AR 16-22.  Stewart explained that the Mackenzie herd was well over its

population goal.  He also explained that the EINP population had "more than enough surplus

bison to meet the requests for founder stock," and indeed, that surplus bison from EINP were

being sold directly to the public due to "low demand for founder wood bison" for large-scale

reintroductions.  AR 18.  Hence, the Northwest Territories government had decided that allowing

limited, regulated hunting was a "logical" means of fulfilling the objectives of the Plan.  Id.

Stewart's letter also described the hunting regulations, permit system, and quotas.  AR 19.

In 2001, Michael Kreger, an FWS employee, wrote to Bertrand Von Arx at the Canadian

Wildlife Service to ask whether herds other than the Yukon herd had reached 400 bison, and "[i]f

not, can the surplus Yukon animals be translocated to increase herd size in other locations?"  AR

69.  Kreger explained that FWS was evaluating "the status of the entire population" in making its

determination on the import permits, not just the status of Yukon herd.  Id.  Von Arx responded

that "this does not make much sense to me," because each herd was managed separately and

excess bison from one herd would not generally be sent to other herds.  AR 68.  Von Arx

explained that Canadian wildlife management avoided mixing animals between herds in order to

preserve biological diversity and avoid the spread of disease.  Id.  He added that all disease-free

herds were currently growing, and that two additional herds were expected to have 400 members

by 2003 and 2015.  Id.

Similarly, in an email to the head of the Yukon Outfitters Association, Kent Jingfors

wrote that he found "the USFWS view that Yukon needs another wild population of wood bison

before they would allow US importation of wood bison trophies a bit strange."  AR 127.  He

explained that "[w]e do not see the need to establish another wild herd to ensure population

viability here," because disease was unlikely to "wipe out" the existing population in the Yukon.

Id.  He also observed that introducing another herd in the Yukon was a complicated question

from an environmental and political perspective, and that "the public debate that would have to

precede the establishment of a second population would probably be quite divided."  Id.

The final significant documents from the 1999-2002 time period were the intra-agency

jeopardy determinations relating to the permits.  As explained previously, FWS must consult

within its agency to "insure that any action authorized, funded or carried out by [FWS] . . . is not

likely to jeopardize the continued existence of any endangered species or threatened species."  16

U.S.C. § 1536(a)(2).  In other words, FWS had to consult within its agency to insure that issuing

permits would not jeopardize the wood bison or any other endangered or threatened species.

FWS staff therefore consulted with Kent Johnson, the Chief of the Branch of Consultation and

Monitoring, about some of plaintiffs' applications.[1]  Johnson found that allowing importation of

wood bison trophies was not "likely to jeopardize the continued existence" of the wood bison.

AR 129-33.  Johnson described the Canadian recovery plan in detail, including the target

population for the Yukon herd, the fact that "[h]arvest is the only factor currently regulating the

size of the herd," the need to harvest 70 to 80 bison each year, and the problems with

_____

[1]  Plaintiffs contend, apparently correctly, that the consultations were not made within the
statutory time limits.  Plfs.' MSJ at 18-19.  However, as the consultations are now complete (and
indeed, the findings were in plaintiffs' favor), this claim is moot.  See supra 7-8.  Plaintiffs also
contend that FWS failed to consult on the jeopardy effects of not issuing the permits, but the
agency was not required to do so.  See Western Watersheds Project v. Matejko, 468 F.3d 1099,
1108 (9th Cir. 2006); Int'l Ctr. for Tech. Assessment v. Thompson, 421 F. Supp. 2d 1, 10-11
(D.D.C. 2006).

reintroducing Yukon bison in other parts of Canada.  AR 131.  In light of those facts and the

management plan for the herd, Johnson found that "the proposed imports will not have a

negative impact on the surviving wild populations of bison."  Id.

After the non-jeopardy findings were made, discussion of the permits apparently lapsed

until late 2008 – i.e., shortly before the time that plaintiffs filed their first lawsuit.  The only

notable document in the interim is a March 2005 letter from the Humane Society opposing the

permits on the ground that "there can be no ethical justification for the pleasure-killing of rare

and endangered species.  There are always alternative ways to enhance the conservation of

endangered species other than by promoting trophy-hunting."  AR 246.

The administrative record picks back up with a handful of articles about wood bison from

late 2008.  By that time, the population of the Yukon herd was approximately 1100, and Yukon

wildlife management wanted it to remain at that level.  AR 251-52.  One article noted that there

were concerns that the growth in the bison population was affecting moose and caribou, and that

bison were damaging property.  Id.  The article also stated that hunting was currently the only

way of managing the bison population, "[a]s there is next to no predation on the transplanted

bison population."  Id.  Another article noted that the EINP herd was still the source for "all

Wood bison re-introduction initiatives."  AR 256.

In March 2009, Susan Fleck, the Director of the Wildlife Division in the Northwest

Territories, wrote to FWS to comment on the downlisting petition for the wood bison.  She

explained that there were 2000 free-ranging bison in two separate populations in the Northwest

Territories and 4500 free-ranging, disease-free bison throughout Canada and Alaska.  AR 260-

61.  In her view, wood bison had shown that "they are very responsive to recovery actions."  AR

261.  She also wrote that a regulated hunting program was not a threat to wood bison recovery.
AR 260.

After gathering all of the foregoing information, FWS began to move towards preparing a
finding on the enhancement issue in response to the permit applications.  In April 2009,
department members had a meeting with "attorney-advisor" Shawn Finley to discuss permit
issues, including a discussion of "legal issues and litigation strategy" relating to the wood bison
trophy import permits and permits for another animal, the straight-horned markhor.  AR 264; see
also Conservation Force v. Salazar, 811 F. Supp. 2d 18 (D.D.C. 2011) (discussing markhor
importation permits).

Shortly after that meeting, on May 7, 2009, Teiko Saito prepared a memorandum on the
issue of wood bison import permits.  AR 269-670.  Saito, then the Acting Assistant Director of
International Affairs at FWS, wrote that wood bison trophy imports had not yet been authorized,
but that "based on the source of the trophies and Canada's management of the species, the
Service is considering authorizing imports."  AR 269.  The memorandum summarized Canada's
"fully developed and functional management program" and noted that sport hunting fit within
that program's objectives, including "encourag[ing] long term cooperative management in which
rural communities and Aboriginal people play an integral role."  AR 269-70.  The memorandum
concluded that "[a]llowing the import of sport-hunted trophies, taken as part of a government-
sponsored program of surplus culling through subsistence and sport-hunting, is likely to enhance
the survival of the species and assist the maintenance and management of the wood bison
population and Canada."  AR 270.

On May 21, 2009, biologist Mike Carpenter prepared a more detailed draft enhancement

finding.  AR 282-87.  In that finding, he wrote that Canada's goal of establishing four free-roaming herds of 400 animals appeared to have been achieved, and that the total population of disease-free, free-range wood bison stood at 4,500.  AR 282.  He also noted that the EINP herd had an annual surplus of "50 or more animals."  Id.  Some were used for "recovery re-stocking, however, there are often surplus animals from this program available to the public or other entities."  Id.  Focusing on the Yukon herd, he wrote that its size had "consistently increased," that it grew annually by 15 or 20%, and that its current size was 1100 animals although the carrying capacity of its habitat was only 1000 bison.  AR 282-83.  Carpenter also noted that the Mackenzie herd in the Northwest Territories was at more than 2,000 animals and was increasing at 13% a year, despite "limited area available for expansion."  AR 283.  Turning to sport-hunting, Carpenter noted the "stringent regulations" governing take of wood bison and "established low quotas" for hunters.  AR 283-84.  As Saito had, Carpenter concluded that sport-hunting fit with the objectives of Canada's recovery plan.  AR 283.

Carpenter then discussed each factor listed in 50 C.F.R. § 17.22(a)(2).  He concluded that the hunting programs were "well managed," and that they were necessary to avoid exceeding the carrying capacity of the habitat.  AR 284.  Exceeding that capacity, he noted, would mean "overutilizing the available resources and potentially stressing the herd, compromising its health."  Id.  Carpenter also observed that U.S. hunters who purchased hunting licenses were "actively supporting" the territorial and national Canadian government recovery plans, as well as reducing the threat of extinction "by giving the species a greater economic value . . . to local communities."  AR 284-85.  Carpenter listed only one potential negative effect of allowing imports: it was theoretically possible that too many mature male bison would be taken relative to

females, but there was "no indication that this would occur."  AR 284.[2]  Accordingly, and in light

of the fact that the Canadian government maintained that hunting was necessary to support its

recovery program, Carpenter concluded that allowing trophy imports was likely to enhance the

survival of the wood bison.  AR 285-86.

FWS's internal discussion then turned to policy considerations.  On May 29, Saito wrote

a memo to Robert Gabel, the Chief of the Division of Management Authority at FWS, on those

issues.  AR 272-73.  Saito explained that the permit applications had remained pending for

nearly ten years in part due to uncertainty about the enhancement finding, but in part because

"the Service has never authorized the import of a sport-hunted trophy of a wild specimen of an

endangered species."  AR 272.  Saito concluded that the wood bison might present "the best case

for issuing such permits," but that granting the permit applications would likely draw criticism

from members of the public, Congress, and various conservation groups.  AR 272-73.  Gabel

affirmed in a later email that they would need to know whether "higher management" would

support issuing permits in principle if enhancement were found.  AR 274.  Additionally, in a

May 29 email to another member of the FWS staff, Gabel wrote that "I'm not sure we've reached

the 'bullet proof' stage yet" on the enhancement finding.  AR 271.

The record is then silent until August 6, 2009, when Shawn Finley scheduled an August

13 meeting to discuss permit applications.  AR 288.  A privilege log shows that several emails

between Finley and other FWS staff were exchanged between June 2009 and August 13, 2009.

---

[2]  A news article in the record shows that Canadian officials were aware of this issue and had taken steps to address it.  See AR 258 (explaining recent changes in hunting rules that encouraged hunting of cows in addition to bulls, in order to "help even out the adult sex ratio of the herd[,] which is likely out of balance because of hunters taking more bulls in the past few years").

See AR [Docket Entry 23], Ex. 3.  Those emails have been withheld on grounds of attorney-client privilege, and Conservation Force has waived its right to challenge that assertion.  Plfs.' MSJ at 3.

By the time of the August 13 meeting, a decision had apparently been made to deny the permits.  In response to Finley's scheduling email, biologist Carpenter wrote an impassioned email to another FWS staff member saying that he had read Finley's comments, that there was "nothing scientific or logical about them," and that Finley needed to be educated "in basic biological concepts and wildlife management and conservation."  AR 289.  According to Carpenter, there was "no rational way" to claim that denying the permits benefitted the wood bison, and that a denial would be "essentially ignoring the science in favor of ????"  AR 289.  The record does not contain any response to this email, or any indication what happened at the August 13 meeting, assuming it occurred..

Two months later, in October 2009, all four permits were denied in identical letters and FWS issued a final finding of non-enhancement.  AR 305-16, AR C335-C341.  In the non-enhancement finding, FWS explained that it had insufficient evidence to determine that approving the permits would have any positive effects on the wood bison's recovery.  It found that granting the permits would likely increase lethal take of wood bison in Canada "through sport-hunting activities by U.S. hunters."  AR C338.  FWS acknowledged that the particular wood bison at issue in this case were taken from habitats that might have exceeded carrying capacity, but FWS "ha[d] no information demonstrating that population pressures on [those] ecosystems 'cannot otherwise be relieved' . . . through such efforts as reintroduction in other areas of the wood bison's historic range."  AR C339.   FWS also found that authorizing

importation of trophies could reduce the amount of stock available for various ongoing

reintroduction projects.  AR C334.

In further support of the denial, FWS noted that "only . . . 4,500" free-ranging, disease-

free bison existed, and that Canada's recovery goal had not been met at the time the bison at

issue were hunted.  AR C337.  FWS also found that issuing or denying permits would not have a

"direct" financial effect on wood bison recovery, because hunting fees did not fund wood bison

management programs.  AR C338.

Finally, FWS acknowledged that sport-hunting was consistent with Canada's recovery

plan, particularly the objective of "establishing a population for sustainable use by rural

communities and encouraging native communities to participate in the management of the

species."  AR C337.  Nonetheless, the FWS found an insufficient conservation benefit to the

wood bison under the standards of the ESA. Hence, because the standards of 16 U.S.C. §

1539(a)(1)(A) and 50 C.F.R. § 17.22 were not met, FWS denied the permits.

As previously explained, the Court's review is narrow, and the Court may not substitute

its judgment for that of the agency.  State Farm, 463 U.S. at 43.  But the agency must "explain

why it is has exercised its discretion in a given manner" in light of the record evidence and the

potential alternatives to the agency's decision.  Id. at 48-49.   Hence, this Court cannot affirm the

agency's decision unless the agency has "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found

and the choice made." Alpharma, Inc., 460 F.3d at 6 (internal quotation marks and citation

omitted).

The Court finds that FWS has failed to articulate a satisfactory explanation for its

decision to deny the import permits.  FWS staff originally drafted enhancement findings that were largely consistent with the factual record that had been developed over the course of several years.  See AR 268-70, 282-86.  Then, with no explanation except for a comment that a decision to grant the permits "is likely . . . to be polarizing," AR 273, FWS reversed course. FWS decisionmakers, of course, have the right to change their minds, reject earlier analyses, decide between conflicting pieces of evidence, and make policy decisions.  See National Cable & Telecomm. Ass'n v. FCC, 567 F.3d 659, 667-68 (D.C. Cir. 2009); see also infra at 22-23.  But they must supply "a reasoned analysis" when they do so, and FWS's final finding lacks such an analysis.  Id.

Several aspects of FWS's final non-enhancement finding are troublesome.  First, FWS never explained why allowing trophy imports would likely increase lethal take of wood bison. See AR C338.  Hunting of wood bison in the Yukon was strictly regulated, and the record suggested that every available annual hunting permit was taken even though importing trophies into the United States was forbidden.  See AR 252.  It was possible that allowing trophy imports would have increased lethal take if, for instance, doing so would have attracted more skilled hunters who were more likely to take a wood bison, but if this was FWS's reasoning, it went unsaid.  See AR 251-52 (explaining that only 35% of hunters successfully take a wood bison). Given that the rest of FWS's finding depended on this fundamental step, FWS needed to explain its logical leap more fully.[3]

FWS acknowledged that the carrying capacity of the habitat of the wood bison at issue

---

[3]  The fact that all available hunting permits are already used each year could also mean that allowing imports into the United States is unlikely to enhance the wood bison's recovery. Again, however, FWS had to explain its rationale, not leave this Court to supply the reasoning.

might have been exceeded.  AR C339.  As a prior draft of the enhancement finding had

explained, exceeding carrying capacity is problematic because "overutilizing the available

resources [can] potentially stress[] the herd, compromising its health."  AR 284.  Hence, FWS

properly acknowledged that some bison needed to be removed from the Yukon herd.  AR C339.

The analysis went askew, however, when FWS concluded that there was "no information

demonstrating that population pressures on [those] ecosystems 'cannot otherwise be relieved' . . .

through such efforts as reintroduction in other areas of the wood bison's historic range," and that

increasing lethal take of bison might reduce stock available for reintroduction efforts.  Id.

Neither of these conclusions is supported by evidence in the record.  On the contrary, there was

considerable evidence that limited available habitat in Canada was one of the primary threats to

the long-term recovery of the wood bison.  See AR 103-07; see also AR 127.  With respect to

wood bison reintroduction outside Canada, the record contained evidence that the EINP herd, the

traditional source for founder stock, had a far greater annual surplus than was necessary to meet

that need.  See AR 18, 86, 110-11.  Canada's recovery plan did state that bison from a wild herd

could conceivably be used for reintroductions, but it suggested drawing on the larger Mackenzie

herd – which also had limited room to grow in its habitat – rather than the Yukon herd.  AR 110-

11.  In short, while it was theoretically true that surplus bison in the Yukon could be relocated

instead of hunted, nothing in the record suggests a realistic possibility that Yukon bison would

be so relocated.  Indeed, when FWS staff asked Canadian officials directly whether surplus bison

from the Yukon could be added to another herd, they were told the answer was no.  AR 69.

FWS did not mention this in its final finding.

FWS also found that issuing or denying permits would not have a "direct" financial effect

on Canada's recovery program, because hunting fees did not go to a specific fund for bison

recovery.  AR C338.  FWS was also required, however, to consider the indirect effects of

granting the permit applications, and it did not mention evidence from Canadian officials that

increasing the value of the hunt increased voluntary donations that went directly to wood bison

recovery.  AR 67.  While FWS might have reasonably questioned this evidence or the

importance of the voluntary donations, FWS was not entitled to ignore this effect under the terms

of 50 C.F.R. § 17.22(a)(2).

  The Court also finds unsatisfactory FWS's treatment of the benefits of hunting to

aboriginal communities.  There is certainly evidence in the record that the fourth goal of

Canada's management plan – "contributing to the aesthetic, cultural, economic, and social well-

being of local communities" – was meant to benefit the local communities, not the wood bison.

AR 80-81.  There is also, however, some indication that "[t]he support and participation of local

communities are important prerequisites for successful reintroduction projects in these

jurisdictions," AR 111, a rationale that has been accepted in other situations where limited

hunting has been seen as a conservation strategy.  See Fund For Animals v. Norton, 295 F. Supp.

2d 1, 10 (D.D.C. 2003) ("First, when the United Stated previously prohibited argali importation

from Tajikistan from 1993-1996, the killing of argali sheep actually increased. This result

occurred because hunting permits were bought at lower prices by non-U.S. hunters. The

diminished revenues from the sale of hunting permits led, in turn, to increased argali poaching

due to local villagers returning to poaching to support their families after losing their hunting

camp jobs, and decreased employment of the game guards who stop argali poaching.").

FWS did not indicate why it rejected the theory that benefitting the local community could also

benefit the wood bison in the long term.

Finally, the Court is troubled by FWS's reliance on the fact that Canada's recovery goal had not been met at the time of the hunts.  In the first place, FWS did not explain why it focused on the time of the hunt, rather than the time of the permit decisions; indeed, its draft enhancement finding had done precisely the opposite.  AR 282.  Second, several Canadian officials had attempted to explain to FWS staff that the herds were managed separately, by different territorial governments, and that only the status of the hunted herd was relevant.  AR 16-22, 69, 127.  FWS completely ignored these explanations and gave no explanation for focusing on the national population of wood bison.  In general, FWS showed a remarkable disregard for what it at one time described as a "well managed" recovery program.  AR 284. FWS need not, of course, defer to Canadian officials' decisions, but it should at least give some indication why it disagrees with them.

Issuance of the permits was not a simple decision, and the Court does not hold that FWS could only have come to one reasonable conclusion based on the record evidence.  In addition, and contrary to Conservation Force's contentions, the Court believes that FWS had some latitude to take broader policy rationales into account in making its decision.  See Plfs.' Opp. at 9-14. Unlike in the context of listing and delisting determinations, agencies are not directed to make permit issuance decisions "solely on the basis of the best scientific and commercial data available."  See 16 U.S.C. § 1533(b)(1)(A).  Rather, under 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22, an agency "may" permit otherwise-forbidden actions that will enhance the survival of an endangered species.  Under 50 C.F.R. § 13.21(b), an agency generally must grant a properly executed permit application, but it need not do so if "[t]he applicant has failed to

demonstrate a valid justification for the permit" or if "[t]he authorization requested potentially

threatens a wildlife or plant population."  Moreover, an agency's decision to issue a permit must

be consistent with the broader "purposes and policy of the ESA," which take into account

ecosystem effects in addition to outcomes for a specific species.  See 16 U.S.C. §§ 1531(b),

1539(d).  Hence, if FWS reasonably arrived at the conclusion that a specific policy reason

prevented it from issuing the permits despite possible enhancement for the wood bison, and

explained that conclusion, the Court might be able to affirm such a decision.  But FWS's denial

letters and its non-enhancement determination do not, in fact, give such a policy reason; instead,

they offer quasi-scientific rationales that the Court finds unconvincing.  Moreover, the evidence

currently in the record does not suggest any policy objective other than a desire to avoid

controversy.[4]  See AR 273.

    The Court recognizes that determinations to deny import permits have been upheld in

three other contexts, but all are distinguishable here.  First, in Franks v. Salazar and Marcum v.

Salazar, courts upheld the denial of import permits for trophies of elephants hunted in

Mozambique and Zambia.  In both cases, the courts relied in large part on the disorganized and

underfunded status of the national conservation program, and the agency's justifiable fear that

---

[4] As part of its summary judgment briefing, FWS has submitted a January 20, 2011 declaration by Teiko Saito that outlines the review process at FWS and explains that the permit applications generated significant policy concerns at FWS.  See Defs.' MSJ, Ex. 2.  While "post hoc litigation affidavits" of counsel are an improper ground on which to base a decision, the D.C. Circuit has found that "[t]he policy of the post hoc rationalization rule does not prohibit an agency from submitting an amplified articulation of the distinctions it sees."  Local 814, Int'l Bhd. of Teamsters v. NLRB, 546 F.2d 989, 992 (D.C. Cir.1976). The Court need not decide whether Saito's affidavit is admissible under this exception, however, because it finds nothing in the affidavit that would change its conclusion.  It is already quite clear from the record that policy concerns drove FWS's decision, but neither the record nor Saito's declaration analyze or explain those policy concerns in any detail.

elephant hunting would not be properly regulated.  <u>See</u> 816 F. Supp. 2d at 61-65; 810 F. Supp. 2d at 73-78.  No such concern, however, is present here.  Additionally, a court agreed with an agency's decision to deny import permits for polar bear trophies because they were not taken from an area approved in a recovery plan.  <u>In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation</u>, --- F. Supp. 2d ----, 2011 WL 4908372, at *14 (D.D.C. 2011).  The court found that the plaintiffs' "bare assertion that sport hunting benefits polar bears because it provides an incentive for native Inuit hunters to adhere to established quotas" was insufficient in the context of a more stringent enhancement standard than the one at issue here.  <u>Id.</u>  In this case, by contrast, plaintiffs do not reply on a "bare assertion," but on evidence gathered by Canadian officials in support of their "well managed" recovery program.  AR 284.

FWS has failed to "articulate a satisfactory explanation for its action" in denying the permits for importation of wood bison trophies.  The Court will therefore remand this case to FWS for further consideration of the four permit applications.  <u>See</u> <u>Alpharma, Inc.</u>, 460 F.3d at 6; <u>State Farm</u>, 463 U.S. at 57.

### C.  "Bundle of Duties"

Plaintiffs' fourth and final claim is that the agency has breached "a bundle of ESA duties."  In their complaint, plaintiffs give a rambling description of this claim.  They begin by stating that the agency "has a bundle of duties under the Endangered Species Act to promote and encourage recovery of foreign endangered species, to cooperate with range nation programs and to consider range nation programs in any actions that might affect those programs. . . . By impeding recovery efforts for the wood bison, Defendants have injured Plaintiffs within the meaning of Article III of the U.S. Constitution."  Compl., Claim IV, ¶¶ 3, 4.

24

Plaintiffs then note the requirement in 16 U.S.C. § 1536(a)(2) that "each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." Id. ¶ 8.  In the next paragraph, plaintiffs write that "[d]efendants' consistent practices of delaying the review of enhancement permit applications, failing to make timely determinations on the downlisting petition, and failing to conduct the mandatory 5-year review have a demonstrably negative effect on the prospects of this endangered species and therefore jeopardize its continued existence." Id. ¶ 9. It is unclear how this assertion relates to the consultation requirement.

Plaintiffs then quote various provisions of the ESA encouraging or requiring certain types of cooperation with foreign states.  Id. ¶¶ 10, 12.  They claim that "[d]efendants have completely failed to account for [Canada's] highly successful wood bison recovery program when considering the de-listing of that species, for if they had, they would have noted the degree to which their delays are actively damaging to the species. This failure has jeopardized the wood bison's continued existence."  Id. ¶ 11; see also id. ¶ 13.  Plaintiffs also claim that FWS's failure to consider the views of Canadian officials means that "any technical determinations they have begun deserve little deference."  Id. ¶ 14.  Plaintiffs end with the claim that "defendants have utterly failed to meet their 'affirmative duty to satisfy the ESA's requirements, as a first priority,' and should be compelled to consider the status of endangered species and indigenous conservation programs both when processing permit applications and when listing or de-listing a species."  Id. ¶ 16.

In their briefing, plaintiffs discuss only two of these jumbled claims.  First, they argue

that "[d]efendants' failure to timely make downlisting determinations, unreasonable delay in the processing permits, low priority treatment of those permits, and eventual unsupported, arbitrary and capricious permit denials are all violations of the duty to conserve and recover species" under the ESA.  Plfs.' Reply at 18.  Second, plaintiffs reiterate that FWS has failed to sufficiently cooperate with Canadian officials and take into account their views.  Plfs.' MSJ at 21-23.

The Court notes that several other judges have rejected similar or identical claims brought by Conservation Force.  See Franks, 816 F. Supp. 2d at 56 (similar claim); Conservation Force v. Salazar, 811 F. Supp. 2d 18, 32 (D.D.C. 2011) (identical claim); Marcum, 810 F. Supp. 2d at 68-71 (similar claim); see also Conservation Force v. Salazar, 677 F. Supp. 2d 1203, 1211-12 (N.D. Cal. 2009) (similar claim).  This Court agrees with those decisions.

Plaintiffs' claims, difficult as they are to decipher, fall into two basic groups.  First, there are claims that allege general violations of the overarching purpose of the ESA.  These claims are not subject to judicial review.  The citizen-suit provision of the ESA allows "any person [to] commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality . . . who is alleged to be in violation of any provision of the [ESA]," which would appear to permit plaintiffs' claims.  16 U.S.C. § 1540(g)(1)(A).  The Supreme Court has clarified, however, that that provision does not authorize claims based on "the Secretary's maladministration of the ESA."  Bennett v. Spear, 520 U.S. 154, 174 (1997).  Rather, the Supreme Court held, § 1540(g)(1)(A) only allows suits based on alleged violations of substantive, non-discretionary duties under the ESA.  Id. at 173-74; see also Franks, 816 F. Supp. 2d at 58-59.  As another judge in this district has explained, Conservation Force's suits based on violations of "aspirational provisions that govern how the Service implements the ESA

. . . are precisely the sort of 'maladministration' claims that cannot be enforced through the ESA's citizen-suit provision."  Franks, 816 F. Supp. 2d at 56.

Plaintiffs' second set of claims does allege violations of substantive, non-discretionary duties.  These claims are subject to judicial review, but fail for other reasons.  Plaintiffs first claim that FWS violated 16 U.S.C. § 1533(b)(1)(A), the requirement that it consider the views of Canadian officials in making listing determinations.  But this claim was not mentioned in Conservation Force's notice of intent to sue, so it is now jurisdictionally barred.  See Conservation Force I, 715 F. Supp. 2d at 102-03; Defs.' Opp. to Plfs.' MSJ and Reply in Supp. of Defs.' MSJ [Docket 41] ("Defs.' Opp."), Ex. 1.  In any event, it is clear that the Secretary's 12-month finding on the delisting issue "t[ook] into account those efforts, if any, being made by any State or foreign nation" on wood bison conservation.  See 16 U.S.C. § 1533(b)(1)(A).  Indeed, as one would expect, the finding is replete with detailed discussions of Canada's conservation plan for the wood bison.  See Not. of Completion of 12-Month Finding and Five-Year Review [Docket 36], Ex. 1.

Plaintiffs also claim that the agency violated its duty under 16 U.S.C. § 1536(a)(2) to perform an inter-agency consultation to "insure that any action authorized, funded, or carried out by [FWS] . . . is not likely to jeopardize the continued existence of any endangered species." FWS did, in fact, carry out an inter-agency consultation on the effects of allowing importation of wood bison trophies.  See AR 130-31. If plaintiffs' claim is that the consultation was untimely, the claim is moot for the reasons given above.  See supra 7-8.

Finally, plaintiffs argue that FWS's "consistent practices of delaying the review of enhancement permit applications, failing to make timely determinations on the downlisting

petition, and failing to conduct the mandatory 5-year review" have violated its duties under the ESA and injured the wood bison.  To the extent this claim is an allegation of substantive violations of 16 U.S.C. §§ 1533(b)(3)(B) and (c)(2), rather than a generalized maladministration claim, it is moot.  See supra 7-8, 26-27; see also Conservation Force, 811 F. Supp. 2d at 32. Moreover, as explained in a previous opinion in this case, there is no requirement that the FWS review permit applications within any particular time period.  Conservation Force II, 753 F. Supp. 2d at 35.  Hence, FWS's leisurely permit review process cannot be said to have violated any non-discretionary duty of the agency.

Because plaintiffs' claims of maladministration are not reviewable, and the substantive claims within the "bundle of duties" asserted by plaintiffs are either jurisdictionally barred, moot, or simply incorrect on the merits, the Court will grant summary judgment to defendants on Count IV.

## V.  Conclusion

For the reasons given above, plaintiffs' summary judgment motion will be granted as to Count III and denied as to the remaining counts.  The government's summary judgment motion is denied as to Count III and granted as to all remaining counts.  A separate Order accompanies this opinion.

_____/s/_____
John D. Bates
United States District Judge

Dated: March 30, 2012