# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CONSERVATION FORCE, et al.,**

     **Plaintiffs,**

          v.

**KENNETH SALAZAR, in his official
capacity as Secretary of the United States
Department of the Interior, et al.,**

     **Defendants.**

**Civil Action No.  10-1057 (JDB)**

## MEMORANDUM OPINION

Plaintiffs, individuals and organizations that support sustainable hunting of the Canadian wood bison, seek attorney fees for their work in this case. In the underlying action, plaintiffs sued the Secretary of the Department of the Interior and the Fish and Wildlife Service (together "FWS"), challenging FWS's conduct surrounding the wood bison's "endangered" classification and FWS's denial of plaintiffs' permit applications. The Court granted summary judgment to defendants on three claims, and granted summary judgment to plaintiffs on the remaining claim. Plaintiffs now seek $258,681.10 in fees and costs for their work on the merits and in the subsequent fee litigation. Defendants argue that a substantially smaller award is justified. For the reasons set forth below, the Court will award $39,740.40.

## BACKGROUND

### I.    Factual Background

Counts I and II of plaintiffs' complaint challenged FWS's failure to conduct a mandatory 12-month finding and five-year review of the wood bison's endangered status under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 et seq. Count III alleged that FWS acted arbitrarily and capriciously in denying four individual plaintiffs' applications to import

wood bison hunting trophies. Finally, Count IV alleged that FWS violated "a bundle of duties" under the ESA.

Because FWS completed a combined 12-month and five-year review before the Court issued a decision, the Court found the first two claims moot, and granted summary judgment to defendants. See Conservation Force v. Salazar, 851 F. Supp. 2d 39, 45 (D.D.C. 2012) ("Conservation Force II"). The Court also rejected plaintiffs' Count IV arguments on the merits. See id. at 56. The Court, however, agreed with plaintiffs on their "primary claim," id. at 45, that denying the individual permit applications was arbitrary and capricious because FWS failed to articulate a satisfactory explanation for the denial, and hence remanded the case to the agency for further consideration of the permit applications. See id. at 54. Defendants filed a motion to vacate the remand instruction, which the Court denied on January 2, 2013. See Memorandum Opinion & Order [Docket Entry 63] (Jan. 2, 2013).

## II.    Statutory Background

Two statutes govern attorney fees in this case. The ESA allows a court to "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 16 U.S.C. § 1540(g)(4). But this fee provision applies only to a "suit brought pursuant to paragraph (1) of this subsection." Id. Paragraph (1), in turn, allows citizen suits in narrow circumstances including "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof," 16 U.S.C. § 1540(g)(1)(A), and "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary," 16 U.S.C. § 1540(g)(1)(C). See also Bennett v. Spear, 520 U.S. 154, 171-74 (1997).

Where no specific fee provision applies, the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(1)(A), directs a court to "award to a prevailing party other than the United States fees and other expenses" in any non-tort civil action "including proceedings for judicial review of agency action, brought . . . against the United States . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." Id.

## ANALYSIS

### I.      Fees for Counts I and II Under the Catalyst Theory

Plaintiffs argue that they are entitled to attorney fees for work on Counts I and II of the complaint, even though the Court granted summary judgments to defendants on those two counts, "because Plaintiffs were the catalyst for Defendants' actions." Pls.' Am. Mot. for Att'y Fees & Costs [Docket Entry 52] at 7 (June 18, 2012) ("Pls.' Mot."). Counts I and II—which challenged the Secretary's failure to make a required 12-month finding and to conduct a five-year review—were actions against the Secretary for failing to perform a non-discretionary act under section 1533. See 16 U.S.C. § 1533(b)(3)(B) ("Within 12 months after receiving a petition . . . the Secretary shall make one of the following findings . . . ."); 16 U.S.C. § 1533(c)(2) ("The Secretary shall . . . conduct, at least once every five years, a review of all species included in [the endangered or threatened species] list . . . ."). Accordingly, these claims arose under the citizen suit provision of the ESA and are governed by ESA's fee provision. See 16 U.S.C. § 1540(g)(1)(C). Unlike statutes that authorize fee awards only to prevailing parties, ESA's fee provision—which allows fees "whenever . . . appropriate," 16 U.S.C. § 1540(g)(4)—permits the Court to award fees under a catalyst theory. See Sierra Club v. EPA, 322 F.3d 718, 726 (D.C.

Cir. 2003) (holding that "the 'whenever . . . appropriate' standard authorizes recovery under a catalyst theory" (omission in original)).

To establish an entitlement to fees under a catalyst theory, a plaintiff must satisfy the "so-called three thresholds test," by showing "that the defendant provided some of the benefit sought by the lawsuit," that the claim "was at least colorable, not frivolous, unreasonable, or groundless," and that the suit "was a substantial or significant cause of defendant's action providing relief." Id. at 726-27 (internal quotation marks omitted).

Defendants never dispute that the first two requirements are satisfied, and with good reason. As to the first, Counts I and II asked the Court to "compel[]" defendants "to reach a conclusion regarding the de-listing of the wood bison" by "issu[ing] a 12-month finding," Compl. Claim I ¶¶ 2, 10 [Docket Entry 1] (June 23, 2010), and "to undertake the five-year review." Compl. Claim II ¶ 4. On January 31, 2011, while the suit was pending, defendants completed the 12-month finding and five-year review. Accordingly, defendants provided some of the benefits sought by the lawsuit. The second factor is also satisfied because the claim was at least colorable—indeed, it was undisputed that neither action was conducted within the prescribed statutory time limit. See Conservation Force II, 851 F. Supp. 2d at 45.

The third requirement, that the suit was a substantial cause of defendant's actions, presents a closer question. To establish causation, "the claimant must show that it is more probable than not that the government would not have performed the desired act absent the lawsuit." Pub. Citizen Health Research Grp. v. Young, 909 F.2d 546, 550 (D.C. Cir. 1990). More specifically, the Court must find that, absent plaintiffs' filing this particular lawsuit, the agency would not have completed the 12-month finding and the five-year review by January 31, 2011. See id. at 549-50. In other words, even if the agency would have eventually completed the

finding and review, plaintiffs are entitled to fees if this lawsuit was a substantial cause of the agency completing the actions by the date that it did. Additionally, to "make this causation showing, plaintiff ha[s] to satisfy the trial court that the suit achieved results by threat of victory, not by dint of nuisance and threat of expense." Sierra Club, 322 F.3d at 726 (internal quotation marks omitted).

Plaintiffs filed this suit on June 23, 2010, and the agency took the desired actions on January 31, 2011. At first glance, this chronology supports an inference of causation. The D.C. Circuit, however, has "caution[ed] against the post hoc ergo propter hoc fallacy." Pub. Citizen, 909 F.2d at 551. That caution is well taken in this case: the full timeline persuades the Court that this suit in no way accelerated the agency's actions.

The relevant events began in 2009. On February 3, 2009, FWS announced that it was initiating a status review of the wood bison, a condition precedent to issuing either a 12-month finding or a five-year review, see 16 U.S.C. § 1533(b)(3)(A), (c)(2). See 74 Fed. Reg. 5908, 5910 (Feb. 3, 2009). In March 2009, the same group of plaintiffs filed a predecessor lawsuit, Conservation Force v. Salazar, 715 F. Supp. 2d 99 (D.D.C. 2010) ("Conservation Force I"), challenging the Secretary's failure to issue the 12-month finding. The Court ultimately dismissed the claim because plaintiffs had failed to comply with ESA's notice requirement before filing suit. See id. at 104. During that litigation, FWS submitted a declaration stating that it had initiated a status review and requested information from interested parties, and that a certain FWS branch "is now responsible for processing" the petition for reclassifying the wood bison "as part of [its] Fiscal Year (FY) 2010 work plan." Frazer Decl. 3, Conservation Force I, 715 F. Supp. 2d 99 (Nov. 23, 2009) (No. 09-496), ECF No. 19-3. It further stated that "the Service anticipates that it will take approximately nine months to complete the status review and prepare

a 12-month finding." <u>Id.</u> Accordingly, the declaration stated that the Service "can complete work on the status review and the 12-month finding for the wood bison and submit the 12-month finding to the Federal Register by September 15, 2010." <u>Id.</u> at 6.

By the time plaintiffs filed this suit on June 23, 2010, the agency was just a few months short of its anticipated completion date. And although the agency ended up missing its own deadline by several months, there is no evidence that it hurried the review because of this suit. Early in this litigation, defendants represented to the Court that the process for completing the 12-month finding and the five-year review was underway, that a particular step of the process was likely to be completed in "early November," and that the entire process would be completed by January 31, 2011. <u>See</u> Frazer Decl. [Docket Entry 25-2] at 6 (Nov. 2, 2010). Consistent with these representations, on January 31, 2011, the agency completed the 12-month finding and the five-year review. The agency's actions occurred 11 days after defendants submitted their cross-motion for summary judgment and opposition to plaintiffs' motion. Briefing was set to conclude on March 3, 2011. <u>See</u> Order [Docket Entry 32] (Dec. 10, 2010). Due to further extensions, the briefing concluded in May 2011, and the Court issued its Memorandum Opinion on March 30, 2012, fourteen months after the agency completed the tasks plaintiffs had sought in Counts I and II.

The agency's actions came well before briefing was due to be completed. If defendants were truly motivated "by threat of [plaintiffs'] victory," <u>Sierra Club</u>, 322 F.3d at 727, they had several months before the threat was a viable one. <u>Compare</u> <u>Pub. Citizen</u>, 909 F.2d at 550-51 (agency's reversal of position eleven weeks after an oral argument at which the district court gave plaintiffs' view a hospitable reaction creates inference of causation). Indeed, the timing of FWS's actions—after defendants had completed their substantive response but more than a

month before briefing was due to end—suggests that this lawsuit was ancillary to the agency's timing.

Plaintiffs have failed to meet their burden of demonstrating a causal link between this suit and defendants' actions. The wheels had been set in motion months before this suit was filed. The agency had previously represented that it was going to take the very actions plaintiffs sought within a set period.[1] Compare id. (agency reversed position after court's reaction to plaintiff's view). And if the agency wished to proceed more slowly, delaying the actions another month or two beyond January 2011, the threat of loss in this suit was no obstacle, for no decision could issue at least until briefing was complete. Accordingly, the record indicates that this suit had no impact on the agency's decision to complete the 12-month finding or the five-year review, nor on the timing of those actions.

Although plaintiffs' decision to file this suit in case the agency veered far beyond its proposed completion date is understandable, the facts simply do not support an inference that the suit accelerated FWS's actions. Rather, this suit was a safety net that never needed to be employed. Plaintiffs argue that, "left to its own priorities," FWS would not have taken these actions by January 31, 2011. See, e.g., Pls.' Reply in Supp. of Mot. for Att'y Fees & Costs [Docket Entry 57] at 5-6 (Aug. 9, 2012) ("Pls.' Reply") ("Nor is it clear FWS would have even included the status review in its 2010 work plan if Plaintiffs had not filed Wood Bison I . . . .").

---

[1] To be sure, the agency's declaration in Conservation Force I discussed only the 12-month finding, making no representation about the five-year review. But the agency has previously used the same status review as the basis for both a five-year review and a 12-month finding. See, e.g., 71 Fed. Reg. 56938, 56947 (Sept. 28, 2006); 69 Fed. Reg. 13326, 13326 (Mar. 22, 2004). Although FWS had no reason to address the five-year review in Conservation Force I, in November of 2010, consistent with this past practice, the agency indicated that "the 12-month finding will serve as our five-year review." Frazer Decl. 4. Plaintiffs have offered no reason to think that, absent this suit, the agency would have treated the review as a basis for the 12-month finding only, despite being beyond the deadline for completing a five-year review and being able to use the review to meet both requirements.

That may be. The filing of <u>Conservation Force I</u>, and the representations the agency made during the course of that suit could have played a role in the process being completed by the targeted date. But the question the Court must ask here is more narrow: had <u>this suit</u> not been filed, would FWS have still completed the same actions by January 31, 2011? On this record, the answer to that question is clearly "yes." Plaintiffs are hence not entitled to fees for Counts I and II under the catalyst theory.

## II.      Fees for Count IV

In their reply brief, plaintiffs argue that they are entitled to fees for Count IV because they achieved some success on the claim and because the claim was inextricably intertwined with "the other three successful claims." Pls.' Reply at 9. Plaintiffs failed to raise this argument in their opening brief, leaving defendants no opportunity to respond. <u>See</u> Pls.' Mot. at 7 ("Because Plaintiffs achieved success on Claims I, II, and III, Plaintiffs are entitled to attorneys' fees and costs . . . ."); Defs.' Mem. in Opp'n to Mot. for Att'y Fees & Costs [Docket Entry 53] at 20 n.9 (July 16, 2012) (noting that plaintiffs have made no arguments about Count IV). It is hence forfeited. <u>See</u> <u>Jones v. Mukasey</u>, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) ("As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply."); <u>see also</u> <u>McBride v. Merrell Dow & Pharm.</u>, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to [a defendant], but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citation omitted)); <u>Rollins Envtl. Servs. v. EPA</u>, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").

On the merits, moreover, the argument borders on frivolous. This Court squarely rejected plaintiffs' fourth claim because the "jumbled" arguments were "either jurisdictionally barred,

moot, or simply incorrect on the merits," and thus declined to award plaintiffs the varied relief they sought. See Conservation Force II, 851 F. Supp. 2d at 55-56. The Court's conclusion was a "loss" for the plaintiffs, not "a failure to reach the merits," and "the ultimate award of fees to petitioners must be reduced by the amount of compensation that petitioners have claimed for time spent on the [losing] issue." Kennecott Corp. v. EPA, 804 F.2d 763, 766 (D.C. Cir. 1986). And, in any case, no time expended on these jumbled and erroneous arguments was reasonable.

### III.    Applicable Statute for Count III Fee Claim

Plaintiffs are entitled to fees on the one remaining claim. They obtained summary judgment on Count III, which alleged that "FWS acted arbitrarily and capriciously in denying the four individual plaintiffs' applications to import their wood bison trophies." Conservation Force II, 851 F. Supp. 2d at 45. Defendants agree that plaintiffs are entitled to fees on Count III. But the parties disagree over whether the ESA fee provision or EAJA governs the award, a distinction significant to the compensable rates.

Plaintiffs contend that Count III falls under 16 U.S.C. § 1540(g)(1)(A) or § 1540(g)(1)(C), thus qualifying them for fees under ESA's fee provision. See 16 U.S.C. § 1540(g)(4). Not so. The claim falls outside section 1540(g)(1)(A), which allows suits "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof," 16 U.S.C. § 1540(g)(1)(A). The Supreme Court has explained that this provision applies only "against regulated parties," and "is not an alternative avenue for judicial review of the Secretary's implementation of the statute." Bennett, 520 U.S. at 173. An agency can itself be a regulated party. For instance, the ESA forbids federal agencies to carry out actions likely to jeopardize the existence of certain species without obtaining an exemption. See 16 U.S.C. § 1536(a)(2). But plaintiffs' argument—that the agency's

review of the permit was arbitrary and capricious—alleges no such substantive violation. Compare Envtl. Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073, 1076, 1079 (9th Cir. 2001) (allowing FWS to be sued under § 1540(g)(1)(A) as a regulated party where plaintiffs alleged that a permit FWS issued would itself jeopardize two species in violation of the ESA). Rather, Count III is a standard challenge to the Secretary's implementation of the statute.[2]

Plaintiffs' argument that this claim arises under § 1540(g)(1)(C) fares no better. That provision allows suits "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). That this provision "covers only violations of § 1533 is clear and unambiguous." Bennett, 520 U.S. at 171. Section 1533 in turn governs the Secretary's determination of whether a species should be classified as endangered or threatened. See 16 U.S.C. § 1533. The Secretary's decisions surrounding permit applications, by contrast, are governed by section 1539, which directs the Secretary to permit, in certain circumstances, an otherwise prohibited act. See 16 U.S.C. § 1539. Moreover, plaintiffs have identified no "clear-cut nondiscretionary duty" that obligated the Secretary to grant the permits. See Conservation Force v. Salazar, 753 F. Supp. 2d 29, 35 (D.D.C. 2010) (internal quotation marks omitted), aff'd, 699 F.3d 538 (D.C. Cir. 2012). Count III thus falls outside section 1540(g)(1)(C).

Instead, as plaintiffs themselves characterize it in their complaint, Count III "seek[s] relief under the Administrative Procedures Act." Compl. Count III ¶ 6; see also Conservation Force v. Salazar, 699 F.3d 538, 540 n.2 (D.C. Cir. 2012) (describing this suit as "challeng[ing]

---

[2] Plaintiffs' argument also runs into an independent hurdle: Count III does not seek to "enjoin" the agency action, see 16 U.S.C. § 1540(g)(1)(A), but rather to "overturn[]" the denials and "grant[] or remand[]" the permits. See Compl. Claim 3 ¶ 8.

the denial of the permit applications as arbitrary and capricious, 5 U.S.C. § 706(2)(A)"). Accordingly, EAJA governs plaintiffs' fee request. See 28 U.S.C. § 2412(d)(1)(A).[3]

### IV.    Size of the Award

Having disposed of the preliminary questions, the Court can turn to determining the proper award here. EAJA fees are calculated using the lodestar method, multiplying each attorney's reasonable hours expended by his reasonable hourly rate. See Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 968 (D.C. Cir. 2004). Determining reasonable hours and reasonable rates is no simple task because the parties dispute a number of issues, some of which, as noted below, have only a trivial impact on the overall award.

### A.  Reasonable Rates

Turning first to reasonable rates, EAJA provides that "[t]he amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that . . . attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor . . . justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A).

### 1. Relevant Community

To find the prevailing market rate for similar work, the Court must first determine whether Metairie, Louisiana—where virtually all the work was performed—or D.C.—where this Court sits—is the relevant community. Normally, "the relevant community is the one in which the district court sits." Donnell v. United States, 682 F.2d 240, 251 (D.C. Cir. 1982). But the D.C. Circuit has established an exception where lawyers "practice in far less expensive legal

---

[3] EAJA bars fees where "the court finds that the position of the United States was substantially justified," 28 U.S.C. § 2412(d)(1)(A). But defendants do not argue against fees on this basis, agreeing that plaintiffs qualify for fees under EAJA.

markets and perform the bulk of their work on the case at home in those markets." <u>Davis Cnty.</u>
<u>Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA</u>, 169 F.3d 755, 759 (D.C. Cir.
1999). In such cases, awarding home market rates "produces a result that better reflects the
purpose of fee shifting statutes," enabling private parties to obtain legal help. <u>Id.</u> "Conversely,
while awarding higher Washington rates would not make it harder for parties to find counsel, it
would produce windfalls inconsistent with congressional intent." <u>Id.</u> at 760.

Here, just as in <u>Davis County</u>, "virtually all of the work was performed in [the home
market]." <u>Id.</u> Indeed, the only time plaintiffs' attorneys spent in D.C. was for a status conference,
a commitment even less substantial than the "short oral argument" that the <u>Davis County</u>
attorneys conducted in the District. <u>See id.</u> Indeed, in this case, D.C. time comprises a mere 1%
of the hours billed. As far as the record reflects, plaintiffs' counsel maintains no D.C. office. The
vast majority of the work in this case could, by its nature, be performed anywhere, and all of
plaintiffs' briefs were signed from Louisiana. Finally, the Louisiana market is, undisputedly, far
less expensive. In such circumstances, an award based on home market rates makes sense. <u>See</u>
<u>id.</u>; <u>see also</u> <u>Rocky Mountain Clean Air Action v. Johnson</u>, No. 06-1992, 2008 WL 1885333, at
*3 (D.D.C. Jan. 28, 2008) (awarding home market rates in similar circumstances and rejecting
argument that "counsel with an 'issue-based,' as opposed to a 'location-based,' practice should
be compensated at the District's rates when those rates happen to be higher").

Plaintiffs argue against applying the <u>Davis County</u> exception because "the requested
award" at D.C. rates "will not overcompensate Plaintiffs' counsel, for they have expended far
more time than requested in the 14 years that Conservation Force has been attempting to obtain
the relief" they have now gotten, Pls.' Reply at 13. But this argument misconstrues the relevant
inquiry. Overcompensation must be viewed in terms of the hours reasonably expended on the

12

single claim on which plaintiffs prevailed, regardless of efforts in the administrative process, in another suit, or on other, noncompensable claims. In other words, the overcompensation inquiry is not a back door for compensating plaintiffs for deductions properly taken elsewhere.

Plaintiffs also argue that the <u>Davis County</u> exception should not apply to the lead attorney, Mr. Jackson, who "has multiple offices and [whose] work occurs around the globe," although "Metairie, LA is his home." <u>Id.</u> Maintaining multiple offices, they contend, leads to higher operational costs. But plaintiffs never allege that Mr. Jackson has a D.C. office, and nothing about this case demanded multiple offices or required that Mr. Jackson work from anywhere other than his home. Indeed, the billing records reflect no time away from Metairie actually spent on this case, except for the brief visit to D.C. mentioned above. The existence of multiple offices and the demands of other cases hence offer no reason to depart from the <u>Davis County</u> exception. More fundamentally, these arguments apply to Mr. Jackson alone. Plaintiffs never explain why Mr. Jackson's global practice would justify vastly higher rates for <u>all</u> the attorneys and paralegals, the rest of whom apparently worked exclusively from Metairie. Yet the choice of location has practical significance only as to these other attorneys and paralegals: as explained below, Mr. Jackson's rate, even using Metairie as the relevant community, is above the EAJA cap, so using D.C. rates would make virtually no difference to his award.[4] In these circumstances, it would be especially improper to award D.C. rates for the Metairie-based associates and paralegals.

### 2. Statutory Cap

---

[4] The only difference to Mr. Jackson's fee award would be in the cost of living adjustment. Using D.C. data for that calculation would raise Mr. Jackson's reimbursable hourly rate by $2.24 and would raise the total award by $108.49.

Identifying the relevant community is only the first step. The next issue is the statutory cap on the prevailing rate in that community. EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Plaintiffs have requested attorney hourly rates between $305 and $735 an hour. And they argue that these rates are justified even under EAJA based on an array of purported special factors including the "contingency nature of the fees," the "stubbornness of Defendants," the "preclusion of other employment," and the "personal and professional sacrifices" of plaintiffs' counsel. Pls.' Mot. at 11-14. However, the Supreme Court has rejected such arguments for departing from the EAJA-capped rate. Pierce v. Underwood, 487 U.S. 552, 573 (1988) (special factors within the meaning of EAJA do not include "the contingent nature of the fee," "[t]he novelty and difficulty of issues, the undesirability of the case, the work and ability of counsel, and the results obtained," nor other "factors applicable to a broad spectrum of litigation").

In their reply brief, plaintiffs focus on Mr. Jackson's "special and exclusive expertise with the legal barriers obstructing the recovery of the wood bison," and his extensive background with these permits over the course of 14 years. See Pls.' Reply at 15 (internal quotation marks omitted). Plaintiffs also mention that, although Mr. Jackson typically charges $850 an hour, he requests "only" $735 per hour here. Id. Not only have plaintiffs failed to cite a single case where a special factor, however extraordinary, warranted more than quintupling the EAJA statutory cap, but they have also failed to establish a legally cognizable special factor. The D.C. Circuit has "made [it] clear that an attorney cannot be awarded enhanced fees under the 'special factor' exception based solely on expertise the lawyer acquired through practice in a specific area of

administrative law." <u>Select Milk Producers, Inc. v. Johanns</u>, 400 F.3d 939, 950-51 (D.C. Cir. 2005). While "lawyers practicing administrative law typically develop expertise in a particular regulated industry, whether energy, communications, railroads, or firearms[,] . . . they usually gain this expertise from experience, not from the specialized training justifying fee enhancement." <u>F.J. Vollmer Co. v. Magaw</u>, 102 F.3d 591, 598 (D.C. Cir. 1996). That is precisely the case here—Mr. Jackson's familiarity with these types of permits comes from experience, not from specialized training. Moreover, at its core, Count III raised a typical APA question about the adequacy of an agency's explanation. While Mr. Jackson's experience-based expertise was undoubtedly helpful, it was by no means necessary to plaintiffs' success. Hence, just as an attorney's "specialized knowledge of the extremely complex federal milk marketing regime" is insufficient in this circuit to enhance fees under EAJA, an enhancement is inappropriate based on Mr. Jackson's expertise. <u>See</u> <u>Select Milk Producers, Inc.</u>, 400 F.3d at 951 (internal quotation marks omitted).

The EAJA-capped rate does, however, allow a cost of living adjustment. Because there is no city-specific cost of living data for Metairie or New Orleans, the Court will use the Bureau of Labor Statistics' Consumer Price Index for All Urban Consumers ("CPI-U"). The cost of living adjustments are calculated "based on the cost of living for the year in which services were provided," not the year the award is made. <u>See</u> <u>Masonry Masters, Inc. v. Nelson</u>, 105 F.3d 708, 711, 713 (D.C. Cir. 1997). Accordingly for each year in which services were performed (2010, 2011, 2012), the Court has calculated the ratio between the CPI-U rate in a certain month of that year, and the CPI-U rate in March of 1996 (when the $125 cap was adopted, <u>see</u> Pub. L. No. 104-121, § 232(b)(1), 110 Stat. 847, 863 (1996)), and used that ratio as a multiplier to augment

the $125 rate. This produces an adjusted maximum hourly rate of $175.96 for 2010, $181.18 for 2011, and $184.50 for 2012.

Before finding the maximum EAJA rate, the Court must resolve one more dispute. Defendants suggest averaging the cost-of-living adjusted rates for 2010 and 2011 to obtain a blended rate because the bulk of the work was performed in those years. Plaintiffs vehemently object, arguing that the Court "could very easily apply different capped rates to the work performed during each year," but, if using the blended rate, the Court "should incorporate the adjusted rates for each of the three relevant years." Pls.' Reply at 14. Applying different capped rates to the work performed each year when plaintiffs provide no summary chart of the hours by attorney broken out by year would hardly be "very eas[y]." Plaintiffs are correct, however, that when using an average rate, including all three years is proper, even where a smaller fraction of the work was performed in a given year. Using an average replaces examining each year individually; it assumes, for simplicity's sake, the work was spread evenly, and this assumption should carry through to each year in which some hours were billed.[5] Averaging the rates for 2010, 2011, and 2012 results in a blended rate of $180.55, which therefore will be employed as the EAJA statutory cap for this litigation.

### 3. Final Rates

The $180.55 figure, of course, only sets the ceiling. See 28 U.S.C. § 2412(d)(2)(A) ("The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that . . . attorney fees shall not be awarded in excess of $125 per hour . . . ." (emphasis added)). Citing recent Eastern District of Louisiana cases, defendants provide undisputed evidence that the "prevailing market rates," for attorneys

---

[5] Despite plaintiffs' ardent objection, this dispute makes only the smallest difference. Using all three years rather than the two defendants suggest raises plaintiffs' award by $95.90.

there are $155 per hour for attorneys with Mr. Goforth's and Ms. McKnight's experience, and $165 for attorneys with Ms. Hamilton's and Ms. Graham's experience. Defendants agree that the prevailing market rates for an attorney as experienced as Mr. Jackson are above the statutory cap.

Plaintiffs also request fees at a $166 hourly rate for paralegal time. Paralegal fees are not subject to the EAJA cap, and so may be recovered at prevailing market rates. See 28 U.S.C. § 2412(d)(2)(A)(ii) ("<u>attorney</u> fees shall not be awarded in excess of $125 per hour" (emphasis added)); <u>see also</u> <u>Richlin Sec. Serv. Co. v. Chertoff</u>, 553 U.S. 571, 590 (2008) ("a prevailing party that satisfies EAJA's other requirements may recover its paralegal fees from the Government at prevailing market rates"). Defendants offer evidence, again undisputed, that the prevailing market rate for paralegal time in Metairie, Louisiana, is $90 per hour, and the Court will use that rate for paralegal work.

Accordingly, the Court finds the following hourly rates reasonable: $180.55 for Mr. Jackson, $165 for Ms. Hamilton and Ms. Graham, $155 for Mr. Goforth and Ms. McKnight, and $90 for Ms. Killen and Mr. Rann.

### B. Reasonable Hours

As explained above, plaintiffs are entitled to fees only on Count III, one of the four claims for which they seek fees. Plaintiffs contend that the time spent on Counts I and II is also compensable because these claims are related to Count III. See <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 434-35 (1983). Counts I and II, which challenged FWS's failure to conduct a nondiscretionary duty under the ESA, are based on different operative facts, statutory provisions, and legal theories than Count III, which challenges the agency's permit decision as arbitrary and capricious. Counts I and II are hence entirely distinct from the claim on which plaintiffs prevailed. See <u>Trout v. Sec'y of Navy</u>, 540 F.3d 442, 447 (D.C. Cir. 2008) ("attorneys' fees

17

should not be awarded for an unsuccessful claim when that claim 'is <u>distinct</u> in all respects from the plaintiffs' successful claims'" (alteration omitted) (quoting <u>Hensley</u>, 461 U.S. at 440)). Only hours expended on Count III are therefore compensable.[6]

Plaintiffs' billing records never specify how their time was divided between the claims, nor have they submitted declarations explaining how the time was allocated. <u>See</u> <u>Hensley</u>, 461 U.S. at 437 (fee movant "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims"); <u>see also</u> <u>id.</u> at 437 n.12 (where "counsel's records do not provide a proper basis for determining how much time was spent on particular claims" the Court "would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees" (internal quotation marks omitted)). In such circumstances, the D.C. Circuit has applied a reduction based on the proportion of successful claims. <u>Kennecott Corp.</u>, 804 F.2d at 768 ("If the amount [necessary to reflect movants' lack of success] cannot be discerned from the record, then the figure shall simply be reduced by one-third."). Because one of four claims is compensable, a proportionate approach would yield a 75% reduction. In this case, however, Count III was plaintiffs' primary claim, so such a reduction would undercompensate plaintiffs. Instead, the Court finds that a 50% reduction is appropriate.

Defendants also argue that plaintiffs seek compensation for an unreasonably high number of hours. Plaintiffs "bear the burden of demonstrating the reasonableness of each element of their fee request." <u>Am. Petroleum Inst. v. EPA</u>, 72 F.3d 907, 912 (D.C. Cir. 1996) ("API"). And in evaluating the number of hours requested, the Court is cognizant that "items of expense or fees

---

[6] As explained above, plaintiffs forfeited the argument that Count IV is related to the compensable claim by raising it only in their reply brief. In any case, Count IV, which plaintiffs themselves describe as "a pioneering claim asking the Court to enforce ESA duties that had not previously been applied in this context," Pls.' Reply at 22, was also entirely distinct from Count III.

that may not be unreasonable between a first class law firm and a solvent client[] are not always supported by indicia of reasonableness sufficient to allow [the Court] justly to tax the same against the United States." Id. (alteration and internal quotation marks omitted). Defendants have pointed to several shortcomings in plaintiffs' request.

First, many billing entries are overly vague. "[S]upporting documentation must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended[.]" Role Models Am., Inc., 353 F.3d at 970 (internal quotation marks omitted). Plaintiffs' records do not provide this "high degree of certainty." For example, all the entries by one attorney state simply "[r]esearch Wood Bison II." See Billing Entries [Docket Entry 52-2] at 15 (June 18, 2012). This is inadequate—it offers the Court no basis on which to determine the reasonableness of expending the claimed number of hours. And a number of other entries list only the name of a brief, e.g., "Opposition to Motion to Strike," "Motion for Summary Judgment, etc.," "Reply/opposition to cross-motion for summary judgment." Id. at 8, 10. Such general descriptions, when used to describe many hours, are insufficient. See New Jersey v. EPA, No. 05-1097, 2012 WL 6604522, at *3 (D.C. Cir. July 20, 2012) (entries likes "draft reply brief" and "continue draft of mercury brief" inadequate when used to describe many hours (alterations omitted)); Role Models Am., Inc., 353 F.3d at 971 (entries like "[r]esearch and writing for appellate brief" inadequate).

Plaintiffs defend this lack of specificity, arguing that "when multiple entries describe a general action, such as research or writing, if it also indicates a specific object, the court can evaluate reasonableness of the total time taken to complete the task," Pls.' Reply at 20. Plaintiffs further invite the Court to infer how attorneys spent their time by examining the entries in conjunction with a "review of the docket" to deduce where the hours went, see, e.g., id. at 19 &

n.4, 20-21. These arguments flip on its head plaintiffs' burden to present well-documented claims that justify the full amount of the award, and they ignore D.C. Circuit precedents requiring specific justification. <u>See</u> <u>New Jersey</u>, 2012 WL 6604522, at *4 (reducing hours substantially where "[m]ovants have failed to meet their burden to show that <u>all</u> hours requested were reasonably expended and avoided duplication" (emphasis added)). A reduction in the hours compensated is hence warranted here.

Second, defendants have identified a number of inconsistencies in the billing records— instances where one attorney's records indicate he spent time meeting with another attorney, but that attorney reports no such meeting. In their reply brief, plaintiffs respond that the other attorneys might have omitted the meetings from their billing records because they "were not necessarily even working on the case at the particular moment" or because their "timesheets are at their desks." Pls.' Reply at 23. But attorneys normally record time despite such circumstances, and the inconsistency leaves some doubt as to whether the hours were actually expended—i.e., whether the attorneys who recorded the hours or the attorneys who omitted the hours erred in creating their records. <u>See</u> <u>Role Models Am., Inc.</u>, 353 F.3d at 972 (deducting hours where "one attorney's records indicate that he or she spent time meeting with another attorney, while the second attorney's records report no such meeting").

Third, plaintiffs request fees for time that is not compensable. For instance, they log hours spent by a paralegal on tasks such as filing, and by a partner on activities like "send[ing] out service," "log[ging] scheduling order on calendar, wall calendar," and "arrang[ing] flight, hotel." Billing Entries 1, 5, 17. Such work does not require a lawyer's or a paralegal's expertise, and thus is not reimbursable under EAJA. <u>See</u> <u>Role Models Am., Inc.</u>, 353 F.3d at 973 (explaining that, regardless of who performs them, "[p]urely clerical or secretarial tasks," such as

filing briefs, "do not warrant reimbursement"); see also In re Olson, 884 F.2d 1415, 1426-27 (D.C. Cir. 1989) (per curiam) ("work done by . . . clerical personnel and other support staff . . . [is] generally considered within the overhead component of a lawyer's fee"). Plaintiffs also request fees for 22.5 hours spent drafting an unfiled motion to supplement the administrative record. Plaintiffs explain that "although the motion was justified," "[a]fter the motion was ready" they made a "strategic decision not to file," and so fees for the hours expended should be awarded. Pls.' Reply at 17. But this misses the point. Filing a motion would not have made the time expenditure reasonable. Plaintiffs' attorneys should have made the strategic decision before expending the hours on the motion. Drafting a motion that by their own (belated) assessment was better left unfiled is not an activity that can be properly taxed to the government. See Hensley, 461 U.S. at 437 (fee movants "should exercise 'billing judgment' with respect to hours worked"). As a final example, plaintiffs seek compensation for an hour spent on a Freedom of Information Act request for documents about wood bison permits. Plaintiffs explain that the request was a more effective way to obtain some materials that they argue should have been included in the record. But the FOIA request was made on April 16, 2012, more than a week after the Court entered judgment in this case, and plaintiffs never explain how such a post-judgment request was relevant to any post-judgment issues or could otherwise be helpful to the litigation.[7]

    Where movants "have not carried their burden," the court will "make adjustments," reducing the award as appropriate. API, 72 F.3d at 912. When, as here, a "large number of entries" suffer from a deficiency, "[a] fixed reduction is appropriate." Role Models Am., Inc.,

---

[7] Defendants also argued that if the Court granted defendants' motion to partially vacate the judgment, any time plaintiffs expended responding to that motion should be excluded from the award. Because the Court has denied the motion, the Court need not address this argument.

353 F.3d at 973. Defendants request a 50% reduction to reflect these shortcomings. While plaintiffs' fee request has a number of deficiencies, the problems are not nearly as grave as those in Role Models, where the D.C. Circuit reduced the allowable hours by 50%, see id. at 974, or in New Jersey, where the reduction was even greater, see New Jersey, 2012 WL 6604522, at *4. On this record, a reduction of 25% is appropriate. In applying this moderate reduction, the Court does not imply that the full amount of the requested award would be unreasonable between plaintiffs' attorneys and a solvent client, see API, 72 F.3d at 916. Nor does this Court intend to diminish the work plaintiffs' attorneys have put in over the years in administrative proceedings or their prior suit. The attorneys are, however, only entitled to fees for time reasonably expended in this case, and the reductions reflect that legal entitlement.

Applying the 50% and then the 25% reductions to each attorney's hours, and then multiplying by each attorney's rate results in an award of $32,175.61.[8]

### C. Costs

Plaintiffs seek $1,020.07 in costs, including $670.07 for travel expenses incurred by their attorneys to attend a status hearing. Defendants respond that travel costs are not reimbursable under EAJA. The Court agrees. See Mass. Fair Share v. Law Enforcement Assistance Admin., 776 F.2d 1066, 1069-70 (D.C. Cir. 1985) (per curiam) (travel expenses such as taxi fares not

---

[8] Plaintiffs did not argue that the time expended on post-judgment work, approximately 67 hours, should be treated differently than the pre-judgment time. It is worth noting, however, that the hours expended post-judgment should be exempt from the first, 50% reduction because they are unrelated to work on Claims I, II, and IV. Nonetheless, if looking at the post-judgment hours separately, the Court would find at least the equivalent reduction reasonable. Plaintiffs billed a majority of post-judgment time to their fee motion, which argued for compensation for far more hours and at far higher rates than plaintiffs are entitled to receive. Indeed, the award of $32,175.61 is about 16% of what plaintiffs' motion sought for that portion of the work. Most of the hours plaintiffs expended pressing this excessive request were not reasonable. Hence, a 62.5% reduction (the combined effect of a 50% then a 25% reduction) of post-judgment hours is independently warranted.

eligible for reimbursement as "costs" under EAJA); see also Cooper v. U.S. R.R. Ret. Bd., 24 F.3d 1414, 1417 (D.C. Cir. 1994) (per curiam) (noting that travel expenses are not reimbursable under EAJA). Accordingly, the Court shall award $350 for costs.

### D.  Fees for Fee Reply Brief

In their fee reply brief, plaintiffs seek $39,304.28 for an additional 84.6 hours the attorneys expended on that reply. As a general matter, "fees for time and expenses incurred in applying for fees are appropriate." Comm'r, INS v. Jean, 496 U.S. 154, 157 (1990). All the time logged on the reply, however, occurred after June 7, 2012, when defendants had made an offer of $34,147.00 for all attorney fees and costs. Defendants' offer was more favorable than the $32,525.61 in fees and costs this Court has concluded that plaintiffs warrant for their work as of that date.

Defendants contend that no fees beyond June 7, 2012, should be recoverable because the offer constituted an offer of judgment. Rule 68 provides that "[i]f the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68. Plaintiffs never respond to this point. Nonetheless, the Court concludes that Rule 68 is inapplicable. Even assuming that an offer to settle attorney fees can qualify as an offer of judgment, the fees plaintiffs seek are not "costs incurred after the offer was made." Id. The Supreme Court has held that attorney fees qualify as "costs" for Rule 68 purposes only "where the underlying statute defines 'costs' to include attorney's fees." Marek v. Chesny, 473 U.S. 1, 9 (1985). EAJA, by contrast, defines attorney fees separately from costs. See 28 U.S.C. § 2412(b) ("a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded"); see also Marek, 473 U.S.

23

at 49 (Brennan, J. dissenting) (listing EAJA in appendix of statutes that define fees separately from costs).

Although Rule 68 does not foreclose recovery for all work after June 7, 2012, plaintiffs' rejection of defendant's offer remains significant. See Moriarty v. Svec, 233 F.3d 955, 967 (7th Cir. 2000) ("Substantial settlement offers should be considered by the district court as a factor in determining an award of reasonable attorneys' fees, even where Rule 68 does not apply."); see also Sheppard v. Riverview Nursing Ctr., Inc., 88 F.3d 1332, 1337 (4th Cir. 1996) (where Rule 68 does not "not require plaintiffs to bear their own post-offer attorney's fees . . . courts may consider a plaintiff's refusal of a settlement offer as one of several proportionality factors guiding their exercise of discretion"). Given defendants' substantial offer—indeed, an offer higher than what plaintiffs were entitled to obtain—plaintiffs' decision to reject the offer and to expend more than two additional weeks defending an excessive fee request was not reasonable. See Sheppard, 88 F.3d at 1337 ("After all, refusing a reasonable offer of settlement promotes few public interests when the plaintiff ultimately receives a less favorable recovery after trial."); cf. Marek, 473 U.S. at 11 ("In a case where a rejected settlement offer exceeds the ultimate recovery, the plaintiff—although technically the prevailing party—has not received any monetary benefits from the postoffer services of his attorney.").

Reducing the award is especially warranted here because the rejected offer would have settled the fee litigation, rather than the underlying suit. At some point, the time attorneys expend to unsuccessfully advocate a higher award must be borne by the attorneys themselves. Indeed, the Supreme Court has noted that "[i]deally, of course, litigants will settle the amount of a fee," litigating the issue "[w]here settlement is not possible," and has warned that "[a] request for attorney's fees should not result in a second major litigation." Hensley, 461 U.S. at 437.

Plaintiffs' attorneys' decision to pursue this litigation beyond June 7, 2012, flouts these principles.

Moreover, in their fee reply, plaintiffs expended time defending many inaccurate points: contending that they should receive fees for Counts I and II and, in a particularly unmeritorious (and forfeited) argument, for Count IV; denying that EAJA applies to Count III; and defending a requested rate many times higher than the EAJA statutory cap. Nor was the reply brief particularly helpful—for instance, plaintiffs failed to respond to defendant's Rule 68 argument, leaving the Court to identify the flaws under that rule, and they provided scant summaries and calculations to aid the ultimate determination. The reply included general citations like "See Declaration," see Pls.' Reply at 18, and made a number of sweeping statements with no citation at all. Finally, plaintiffs spent time fighting minor points that make a trivial difference in the fee award.

In light of all this, the Court finds that only 20% of the hours expended on the reply brief were reasonable. Multiplying the reduced hours by the rates of the attorneys involved, the Court will award $2,664.53 for that work.

### E.  Fees for Work on Appeal

On December 14, 2012, plaintiffs filed a supplement seeking fees for 38.7 hours expended defending the judgment on appeal. Defendants appealed the Court's decision on Count III "out of an abundance of caution" on November 1, 2012, see Defs.' Notice of Appeal [Docket Entry 58] at 2 (Nov. 1, 2012), nearly seven months after the Court entered judgment, see Memorandum Opinion & Order [Docket Entry 63] at 2 & n.2. Plaintiffs responded, arguing at length that the appeal was untimely. Defendants then moved to voluntarily dismiss the appeal with each side bearing its own costs. Plaintiffs opposed the motion, objecting to the provision

distributing costs because, in their view, such a division had the potential to hinder their request for appeal-related fees. The D.C. Circuit granted defendants' motion while clarifying, consistent with defendants' arguments, that the dismissal has no bearing on plaintiff's ability to seek fees. See D.C. Circuit Order, 12-5343 [Docket Entry 60] (Nov. 28, 2012).

Defendants argue that plaintiffs warrant no fees for the appeal because, although they prevailed in the district court, they did not prevail at the appellate level. Other courts in this district have persuasively reasoned that a party prevails in the case as a whole and need not achieve additional relief at each stage of the litigation. See Doe v. Rumsfeld, 501 F. Supp. 2d 186, 191 (D.D.C. 2007); Dougherty v. Barry, 820 F. Supp. 20, 25 (D.D.C. 1993); cf. Jean, 496 U.S. at 161-62 ("While the parties' postures on individual matters may be more or less justified, the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items."). In any case, even if plaintiffs were required to "prevail" on appeal, they did so: the D.C. Circuit's order dismissed the appeal, thus preserving plaintiffs' victory on Count III. That the D.C. Circuit did so in response to defendant's motion for voluntary dismissal is irrelevant. See Green Aviation Mgmt. Co. v. FAA, 676 F.3d 200, 205 (D.C. Cir. 2012) (defendant prevailed when judge dismissed case with prejudice upon plaintiff's withdrawal of the complaint).

Defendants also contend that plaintiffs' efforts were not necessary because plaintiffs responded well ahead of the deadline for dispositive motions. Had they waited, defendants argue, plaintiffs would have had to expend no time on the timeliness arguments because defendants would have withdrawn the appeal. But there is no reason to think that defendants would have withdrawn their appeal in the absence of plaintiffs' motion. And, even if such an inference were proper, defendants' argument relies improperly on hindsight. See New Jersey, 2012 WL

6604522, at *2. Given defendants' notice of appeal, plaintiffs' prompt and thorough response was entirely reasonable. A party is under no obligation to drag its feet until the deadline in hopes that the adversary will change its mind, obviating the need for a response. Defendants could have considered more carefully before filing the appeal or decided to withdraw more promptly. Having failed to do so, they are liable for fees for time plaintiffs reasonably expended in response.

Most of the hours plaintiffs expended are compensable. Their billing records are specific and justify the full amount of time spent opposing the appeal on timeliness grounds. The hours expended after defendants proposed voluntary dismissal because plaintiffs objected to each side bearing its own costs, are, however, a different matter. Plaintiffs concede that they incurred no costs on appeal, and, as defendants argued and the D.C. Circuit noted, the division of costs has no impact on attorney fees. Accordingly, the 9.3 hours expended by Mr. Goforth and .66 hours expended by Mr. Jackson in opposing voluntary dismissal, cannot be taxed against the government.[9] The Court will hence award fees for 3.7 hours expended by Mr. Jackson and 25 hours expended by Mr. Goforth. Multiplying these hours by the reasonable rates determined earlier, the total award for work on the appeal is $4,550.26.

## CONCLUSION

For these reasons, the Court will award plaintiffs $39,390.40 in fees and $350 in costs. A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

---

[9] Moreover, even if plaintiffs could have reasonably believed that the division of costs might pose an obstacle to seeking fees, the time they spent fighting the division of costs—more than a third of the hours expended on the substantive appeal—solely to eliminate an unlikely hindrance to collecting appeal-related fees was excessive.

Dated:  <u>January 7, 2013</u>